5 A.3d 142

**BTR HAMPSTEAD, LLC**

v.

**SOURCE INTERLINK DISTRIBUTION, LLC.**

**No. 199, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Sept. 14, 2010.

540

Donald J. Walsh (Offit Kurman, on the brief) Owings Mills, MD, for appellant.

Francis J. Gorman (Angela D. Sheehan, Neal S. Dongre, Gorman & Williams, on the brief) Baltimore, MD, for appellee.

Panel: WOODWARD, KEHOE and JAMES P. SALMON, (Retired, Specially Assigned), JJ.

WOODWARD, J.

Appellee, Source Interlink Distribution, LLC ("Source Interlink"), leased warehouse and office space from appellant, BTR Hampstead, LLC ("BTR"). After a dispute arose between the parties, occasioned by the flooding of the space adjacent to Source Interlink's premises, Source Interlink filed a complaint on September 28, 2007, in the Circuit Court for Carroll County, seeking, *inter alia,* (1) a declaration that its Agreement of Lease ("Lease") with BTR was terminated, and (2) an award of money damages. On December 3, 2007, BTR filed a counterclaim against Source Interlink for "rent due and owing," arguing that Source Interlink was in breach of the Lease. After a three-day trial, on March 24, 2009, the circuit court entered judgment that the Lease was terminated effective September 28, 2007, and awarded Source Interlink $149,467.04 in damages. The court denied all relief to BTR on its counterclaim.

On appeal, BTR presents three questions for our review, which we have expanded into four questions:

I. Did the circuit court err by finding that the actions of BTR relating to Source Interlink's premises after the flood in May of 2007 constituted an actual eviction?

II. Did the circuit court err by finding that Source Interlink did not waive its right to claim an eviction and to declare the Lease terminated?

III. Did the circuit court err by ruling that the terms of the Lease did not permit the actions of BTR relating to Source Interlink's premises after the flood in May of 2007?

IV. Did Source Interlink prove damages to a reasonable certainty?

For the reasons set forth herein, we shall affirm the judgment of the circuit court.

## BACKGROUND

The facts of the instant case are not in dispute. We shall adopt and incorporate substantial portions of the factual histo-

ry as set forth by the Circuit Court for Carroll County in its Memorandum Opinion, dated March 23, 2009:

1. BTR ... is in the business of the ownership and leasing of real estate and owns the land and improvements at 626 Hanover Pike, Hampstead, Maryland ("Hampstead Facility"). The total square footage in the Hampstead Facility is approximately 800,000 square feet.

2. BTR is the Landlord and Source Interlink ... is the Tenant under an Agreement of Lease ("Lease") at the Hampstead Facility and leased approximately 126,000 square feet of space.

3. Fidelitone Logistics ("Fidelitone"), another tenant in the Hampstead Facility during the relevant time period, leased approximately 185,000 square feet of space adjacent to Source Interlink's premises.

\* \* \*

6. In March 2006, Source Interlink acquired Anderson News, LLC ("Anderson"), which included acquisition of the Lease at the Hampstead Facility.

\* \* \*

15. The Lease at issue in this case was first executed in November 1999 and is for approximately 126,786 square feet which is comprised of 114,891 sq. ft. of warehouse space and 11,895 sq. ft. of office space.

16. The Lease will expire by its terms on January 31, 2010.

\* \* \*

33. After acquiring the [L]ease from Anderson News in March 2006, Source Interlink continued to use the space as a distribution center for approximately five months, until late August or early September of 2006.

34. In approximately September 2006, Source Interlink began decommissioning the leased premises as a distribution center and moving that portion of Source Interlink's operations to a distribution center in Lancaster, P[ennsylvania]. The decommissioning process took about two months.

35. During the fall of 2006, Source Interlink caused the leased premises to "go dark," which is a term used by Source Interlink to mean that the space was no longer being actively used for the purposes of that Facility, but Source Interlink continued to honor and fulfill its lease obligations with respect to the facility. Source Interlink continued to pay the rent and other related charges to BTR after the facility was decommissioned.

\* \* \*

38. When Source Interlink decommissions a facility, it hires a third party or someone within the company to be responsible for periodic inspections of the facility to ensure that safety and maintenance concerns are addressed on a regular basis.

39. Robert Schuler ("Schuler"), Source Interlink's National Maintenance Manager, hired Harold Raines ("Raines") to periodically inspect the leased premises after it was decommissioned.

40. Raines began visiting Source Interlink's leased premises to check on it around the middle of October 2006.

41. Between October 2007 and April 2007, Raines visited Source Interlink's leased premises three days a week because those months were cold weather months. During warm weather months, Raines visited once a week.

\* \* \*

44. Source Interlink attempted to sublease the premises in the fall of 2006 after the premises had been decommissioned.

45. The subleasing efforts were coordinated by Mohr Partners, Inc., who in turn hired a local real estate [broker] to conduct the marketing of the leased premises for sublease.

46. Source Interlink requested Mohr Partners to hire a new local real estate broker, Mackenzie Commercial Real Estate Services, LLC, to market the leased premises for sublease. Daniel A[.] Hudak ("Hudak"), Senior Vice President/Principal of Mackenzie, was contacted by Mohr Partners to assist the resident local broker. . . .

47. In early to mid-October 2007, [Mohr Partners] called Hudak and instructed him to stop marketing the warehouse space for sublease as of October 15, 2007, until further notice because of a legal dispute. Hudak complied with this instruction.

\* \* \*

86. Early in the morning on Saturday morning of Memorial Day weekend of 2007, the closed-loop water pipe system burst at a point located in the ceiling of Fidelitone's space at the Hampstead Facility.

87. [Anna Dziewanowski, the Senior Property Manager at BTR] received a call . . . early in the morning that required her to come to the Hampstead Facility. [Michael] Clark[, a member of BTR] received a call from Dziewanowski in the early morning of Saturday, May 26, 2007 advising him of the leak and flooding. Fidelitone's warehouse manager, Richard Rae ("Rae"), also showed up on Saturday morning.

\* \* \*

96. Shortly after BTR and Fidelitone representatives arrived at the Hampstead Facility on the day of the flood, there was a meeting among Clark, Rae, and two members of BTR Management's property management staff.

97. During or shortly after this meeting, Clark, on behalf of BTR, made the decision permitting Fidelitone to move its products into the Source Interlink premises.

98. BTR's decision was oral and never put in writing. There is no written documentation of the dealings, arrangement and communication between BTR and Fidelitone about Fidelitone's use of the Source Interlink space.

99. BTR considered its decision to permit Fidelitone to occupy the Source Interlink space to be an emergency decision.

100. The exigency that caused BTR to permit Fidelitone to put its product in the Source Interlink space ended no later than June 15, 2007.

101. A hole was cut in the demising wall between the Fidelitone space and the Source Interlink space on the day of the flood. Fidelitone began using forklifts to move [its] product into the Source Interlink space immediately.

\* \* \*

105. Fidelitone was able to start operating again on May 29, 2007, the Tuesday after Memorial Day Weekend. There was no interruption in Fidelitone's business operations as a result of the flooding of its space.

106. BTR never asked Source Interlink for its consent to allow Fidelitone to use Source Interlink's premises.

107. Source Interlink never gave permission or authorization to BTR to allow Fidelitone to enter Source Interlink's leased premises, use the premises, or conduct operations there for six months. Raines never gave permission on behalf of Source Interlink for BTR to put Fidelitone into Source Interlink's space.

\* \* \*

111. After Raines observed Fidelitone's use and occupancy of Source Interlink's leased premises for the first time, he called Schuler, his contact at Source Interlink, to inform him. Schuler was not aware of what had occurred at the Hampstead Facility until Raines informed him.

112. [Thomas] Ramage[, the National Property Manager of Source Interlink], did not find out about the flood and Fidelitone moving into Source Interlink's space until a telephone conversation he had with [Jeffrey] Rodgers[, BTR management employee who handled various accounting matters] on or about June 13, 2007. . . .

113. The only written notification BTR gave to Source Interlink is a letter dated June 8, 2007, from Rodgers to Ramage. Ramage did not receive the letter until June 18, 2007. Rodgers' letter stated that there had been a water pipe leak in the Fidelitone space, that BTR had allowed Fidelitone to "temporarily" move some product into Source Interlink's space while Fidelitone's space was restored, and

that BTR would be moving Fidelitone's product back as soon as possible.

114. BTR did not provide Source Interlink with any information as to the nature of Fidelitone's usage of Source Interlink's space.

115. Fidelitone moved the majority of its product (about sixty percent) that was on the floor at the time of the flood into Source Interlink's space and eventually moved everything on racks into Source Interlink's space.

\* \* \*

118. Fidelitone used approximately eighty percent of Source Interlink's space for most of the time it was using and occupying Source Interlink's space. The average number of pallets of product Fidelitone kept in the Source Interlink space between Memorial Day and the end of October was approximately 1,000 to 1,200 pallets.

119. Fidelitone used the bay doors in Source Interlink's space for unloading trucks and receiving product. This was an improved operating situation for Fidelitone because the Source Interlink space provided Fidelitone an additional number of bay doors.

120. At any given time, approximately ten Fidelitone employees would be working in the Source Interlink space.

121. Clark[, from BTR] testified that Fidelitone used and occupied 115,000 square feet of Source Interlink's space, constituting substantially all of Source Interlink's warehouse space.

\* \* \*

124. On July 2, 2007, Ramage went into the Source Interlink space and observed that roughly one-hundred thousand square feet of the warehouse space was full of Fidelitone product. He also observed that there were a number of forklifts moving back and forth and that delivery trucks were being loaded and offloaded from the bay doors of the leased premises. He also observed that there was a large hole in the demising wall between the leased premises and Fidelitone's space. Ramage had trouble opening the access

doors to the Source Interlink space because Fidelitone had put pallets of inventory stacked six to eight feet tall.

125. Ramage also observed during his visit on July 2, 2007, that Fidelitone was using Source Interlink battery chargers to charge Fidelitone's forklifts.

126. Raines observed during his visits that the amount of Fidelitone's inventory being stored in Source Interlink's leased premises increased and that Fidelitone's use of the space appeared to be a "full operation." Raines observed that all the bay doors were open, trucks were backed up to the bay doors for loading and forklifts were moving equipment around.

127. Fidelitone received the benefit of use of the heating and electric utility in Source Interlink's leased premises.

128. BTR admits that Fidelitone acted like a tenant in Source Interlink's space. BTR knew that Fidelitone was storing product, operating forklifts, and utilizing the Source Interlink loading/unloading docks.

\* \* \*

130. Ramage inspected the Source Interlink space at the Hampstead Facility on July 2, 2007. Ramage personally observed Fidelitone's usage of the leased premises and took photographs during his July 2, 2007, inspection. Raines met Ramage at the Hampstead Facility on July 2, 2007. No BTR representatives were present during Ramage's July 2 inspection. Ramage immediately telephoned [David] Buck[, Source Interlink's Vice President for Facilities] to inform him.

\* \* \*

134. A meeting was held between Ramage and Clark at the Hampstead Facility on July 17, 2007. Ramage told Clark that it had taken BTR two weeks to notify him that Fidelitone had been granted access to use the Source Interlink space. Ramage told Clark how "shocked" he had been to see on his July 2, 2007, inspection that Fidelitone was actually conducting operations in the Source Interlink space.

135. Ramage also told Clark that Source Interlink had not given permission to either BTR or Fidelitone for Fidelitone to use and occupy the leased premises and that Ramage believed BTR to be in breach of the lease.

136. Ramage told Clark that Source Interlink had been told that Fidelitone's use and occupancy of the leased premises would only last for a few days or a week, but that it in fact had already lasted more than a month.

\* \* \*

141. In total, the cleanup and restoration of Fidelitone's space took approximately two months, during June and July of 2007.

142. Even after the July 17, 2007, meeting with Ramage, BTR continued to allow Fidelitone to use and occupy Source Interlink's leased premises.

143. No one at BTR told Fidelitone to stop loading and unloading and otherwise to stop operating out of the Source Interlink space. BTR did not give Fidelitone a deadline to get Fidelitone's product out of the Source Interlink space.

\* \* \*

147. Fidelitone operated in Source Interlink's leased premises for six months.

148. On November 15, 2007, Raines observed Fidelitone still using the Source Interlink space.

149. Fidelitone was not completely out of Source Interlink's space until the last weekend of November 2007.

150. BTR did not abate Source Interlink's rent, [common area maintenance ("CAM") charges], taxes or insurance during the period June, July, August, and September of 2007.

\* \* \*

152. Fidelitone was never asked by BTR to compensate Source Interlink for Fidelitone's use of the Source Interlink space.

153. Source Interlink continued to pay rent and other related charges to BTR for the months of June, July,

August, and September 2007 while Fidelitone was using and occupying Source Interlink's leased premises.

154. BTR suffered no loss or rental income as a result of the flood because, in addition to charging and collecting from Source Interlink, Fidelitone also continued to pay rent on its leased premises during the time Fidelitone was using Source Interlink's space.

155. In August 2007, Ramage sent two letters—August 10 and August 13, 2007—in an effort to generate a response from [BTR] that would lead to an end to Fidelitone's use of the Source Interlink premises.

\* \* \*

157. No one from BTR ever responded in any fashion to Ramage's August 10, 2007, letter.

\* \* \*

159. No one from BTR ever responded in any fashion to Ramage's August 13, 2007, letter.

\* \* \*

161. No claim was submitted to BTR's insurer for any loss of business or interruption suffered by Fidelitone.

162. The claim submitted by BTR to its insurer because of the flood included two months of rent on the Source Interlink's space. The total amount paid by BTR's insurer to BTR for the rent portion of the claim was $76,000.

\* \* \*

164. BTR did not contact Source Interlink to inform Source Interlink about any communications with the insurance company. Source Interlink was never contacted by any insurance agency regarding reimbursement.

165. BTR never paid any insurance monies to Source Interlink.

\* \* \*

169. BTR did not tell Fidelitone to move out of Source Interlink's space until after [the] lawsuit was filed prior to filing suit.

170. Source Interlink instructed Raines to continue to check the facility periodically after the lawsuit was filed for the purposes of safety and security. Source Interlink still has Raines visit the space on a weekly basis continuing his inspections and check of the heat. Source Interlink had Raines clean the filters in the heaters, check on the fire extinguishers and also contract with a contractor in January and February, 2008 to service the heaters in the space.

171. As a result of Raines[ ] checking the facility for any problems, he discovered in March 2008 a gas leak which was repaired in March 2008.

172. Since the conclusion of the second day of trial in this case in August 2008, Raines has made periodic visits to the premises to check that the premises are safe, secure, and free of vandalism and to set the heat at 50 degrees to make sure the pipes do not freeze.

173. In addition to continuing to insure the property, retaining keys to the property and accessing the property, Source Interlink left a large piece of equipment stored at the facility which it has unsuccessfully attempted to sell since it decommissioned the space. The costs to remove this equipment, which are separate from the repairs to the building, involve use of heavy equipment at a cost estimate of $8,500.

174. Source Interlink has never offered or attempted to return the keys to the property.

175. The total amount of base rent, CAM charges, insurance, and real estate tax payments that Source Interlink paid to BTR during the months of June, July, August, and September of 2007 was $149,466.04.

## The Dispute

On September 28, 2007, Source Interlink filed a complaint against BTR for, *inter alia,* a declaration that the Lease was terminated and for an award of money damages. Sometime in October of 2007, after it filed the complaint, Source Interlink called Hudak and instructed him to stop marketing the ware-

house space for sublease because of the legal dispute. Source Interlink, however, continued to insure the property, to inspect and access the property for the purposes of safety and security, and retained the keys to the property. Source Interlink also used the property to store its air system, a large piece of equipment mounted on the roof, with an estimated removal cost of $8,500.

On December 3, 2007, BTR answered the complaint, listing the affirmative defenses of accord and satisfaction, contributory negligence, estoppel, laches, release, and waiver. On the same day, BTR filed a counterclaim alleging that Source Interlink "ha[d] not paid the rent due and owing under the lease for the months of October and November and ha[d] not paid the rent to BTR for December," and thus argued that Source Interlink was in breach of the Lease. Source Interlink answered the counterclaim on January 3, 2008.

Trial was held on August 25, 28, and December 19, 2008. On March 24, 2009, the circuit court entered Judgment, which stated, in relevant part:

> ORDERED, that the Court declares the Lease between BTR [ ] and Source Interlink [ ] is terminated effective September 28, 2007; and it is further
>
> ORDERED, that judgment is entered in favor of Source Interlink [ ] against BTR [ ] in the amount of $149,467.04; [1] and it is further
>
> ORDERED, that all other relief requested by either party be and the same is hereby DENIED.

---

1. The award of damages consisted of (1) $149,466.04, representing the base rent, CAM charges, insurance, and real estate tax payments paid by Source Interlink to BTR for the months of June, July, August, and September of 2007, and (2) $1.00, representing nominal damages for BTR's breach of contract by billing Source Interlink for excessive gas and electricity charges. The circuit court found that Source Interlink failed to prove its contractual damages, *i.e.*, the over payment of the gas and electricity charges. Source Interlink did not file a cross appeal challenging that determination.

BTR timely noted an appeal from the judgment of the circuit court. Additional facts will be set forth as needed to resolve the questions presented.

## DISCUSSION

### I.

***Did the circuit court err by finding that the actions of BTR relating to Source Interlink's premises after the flood in May of 2007 constituted an actual eviction?***

In its thorough and well-reasoned Memorandum Opinion, the circuit court first ruled that, "[b]y moving Fidelitone into space rented by Source Interlink, BTR breached the covenant of quiet enjoyment in the Lease." (Emphasis omitted). The court explained:

> BTR contends that it did not interfere with Source Interlink's use of the premises, only with its rights to use same, while Source Interlink contends the interference with the right to use the premises was a material breach of the covenant of quiet enjoyment. **None of the cases cited by the parties involve holdings that address the difference between the legal effect of depriving a tenant of actual use rather than a right to use.** The Restatement, however, makes clear that it is interference with a permissible use that is necessary:
>
> > Except to the extent the parties to a lease validly agree otherwise, there is a breach of the landlord's obligations if, during the period the tenant is entitled to possession of the leased property, the landlord, or someone whose conduct is attributable to him, interferes with a permissible use of the leased property by the tenant.
>
> A "permissible use" is "*any use* ... that the tenant is authorized to make." By giving Source Interlink's space to Fidelitone, BTR interfered with *every use* Source Interlink was authorized to make.

(Emphasis added) (citations omitted) (italicization and alteration in original).

The circuit court further ruled that, "[b]y moving Fidelitone into space rented by Source [I]nterlink, BTR evicted Source Interlink." (Emphasis omitted). The court reasoned:

**In addition to breaching the covenant of quiet enjoyment, BTR's acts totally interfered with Source Interlink's right to use and enjoy the premises, amounting to an eviction. This entitled Source Interlink to terminate the lease.**

**Here, BTR retook possession of the premises without the consent of or notice to Source Interlink.** Although BTR knew that Source Interlink objected to Fidelitone being in its premises, BTR did nothing to move Fidelitone out until after this suit was filed. Further, BTR continued to send regular rent bills to Source Interlink, and refused Source Interlink's requests for information as to BTR's intentions. **Although BTR contends that its appropriation of the premises was temporary, its refusal to act or even communicate on the subject belied that assertion and entitled Source Interlink to terminate the lease by declaring an eviction.**

Source Interlink's termination of the Lease is not precluded by Source Interlink's failure to remove its battery chargers or trade fixtures. Restatement, Section 10.1 Comment (e) states:

The tenant may vacate the leased property without totally emptying the Premises of his property, as long as what is left does not constitute a substantial interference with the landlord's retaking possession.

This residual property did not affect in any way BTR's retaking of the premises, or the continued use thereof by Fidelitone. In addition, any effort to remove this property would have been inconsistent with the occupation of the premises by Fidelitone. The battery charges were actually being used by Fidelitone, and the removal of the chute would have required not only roof but interior access into rental space then fully used by another business. Finally, while Source Interlink did retain keys, it did so not to make commercial use of the space but to provide for the security

of the premises during this dispute. This in no way interfered with Fidelitone's use of the premises.

(Citations omitted) (emphasis added).

In its initial brief in this Court, BTR argues that its actions did not constitute a constructive eviction. This argument, however, invokes the wrong doctrine of law, because the doctrine of constructive eviction is not applicable to the facts of the case *sub judice*.[2] In its reply brief, BTR clarifies that the circuit court erred in finding that BTR evicted Source Interlink from the property. According to BTR, Source Interlink (1) had decommissioned the property and was only using it to store equipment, (2) "continued to store and showcase property in the facility" even after Fidelitone had left, (3) was informed at all times by BTR that Fidelitone's occupancy was only temporary, and (4) "maintained the keys to the premises and continued to access the property weekly." Such facts, argues BTR, demonstrate that BTR did not "interfere[ ] with *any* of the activities which Source [Interlink] conducted in the space prior to, during or after the flood." Because Source Interlink's "use of the space and its activities with respect to the space never changed," BTR argues that it

---

**2.** In *Stevan v. Brown*, 54 Md.App. 235, 458 A.2d 466 (1983), this Court explained:

> A constructive eviction occurs when the acts of a landlord cause serious or substantial interference with the tenants' enjoyment of the property which results in the tenant vacating the premises. These acts must be done by the landlord with the intent and effect of depriving the tenant of the latter's use and enjoyment. But the requisite intent may be inferred from the nature and impact of the acts.

*Id.* at 240, 458 A.2d 466 (citations omitted). Acts resulting in constructive eviction include failure on the part of the landlord "to furnish heat, elevator service, and necessary electricity . . .; as [well as] the failure to furnish sanitary restroom facilities (along with other problems), and frequent flooding of the premises because of the landlord's fault." *Id.* (citations omitted).

In the instant case, BTR permitted Fidelitone to occupy substantially all of Source Interlink's leased warehouse space. For reasons that will be explained *infra*, such actions constitute an actual eviction, not a constructive eviction.

was "impossible to have an actual eviction." We disagree and explain.

■ Our review of Maryland case law has disclosed no definition of "actual eviction." Black's Law Dictionary 35 (6th ed.1990) defines actual eviction as "[a]n actual expulsion of the tenant out of all or some part of the demised premises. A physical ouster or *dispossession from the very thing granted or some substantial part thereof.*" (Emphasis added). Thompson on Real Property § 41.03(c)(2), entitled "Actual Eviction by the Landlord," explains:

> The landlord will be in breach of the implied covenant of quiet enjoyment if the landlord, or someone for whose acts the landlord is responsible, wrongfully ousts the tenant from the leased premises. **The cases refer to this conduct, which can take the form of physical expulsion or a physical exclusion of the tenant from the leased premises, as an actual eviction.** Particular acts by the landlord that have been found to be sufficient to constitute actual eviction of a tenant have included changing the locks on the leased premises, refusing to permit the tenant to enter a building in which space has been leased, padlocking the entry to the leased premises, and taking possession of the leased premises with threats of violence against the tenant or members of the tenant's family if they attempt to re-enter.
>
> The cases also recognize that the landlord's eviction efforts may deprive the tenant of only a portion of the leased premises, leaving the tenant in possession of the remainder. If the landlord deprives the tenant of a significant portion of the leased premises, the landlord's conduct will generally be regarded as constituting a partial actual eviction, and a breach of the implied covenant.

(Emphasis added) (footnotes omitted); *see also Cunningham v. Universal Underwriters,* 98 Cal.App.4th 1141, 120 Cal. Rptr.2d 162, 168–69 (2002) ("The legal definition of an eviction is the same: an 'eviction' is '[t]he act or process of legally dispossessing a person of land or rental property.' (Black's

Law Dict. (7th ed.1999) p. 575, col. 2.) A *wrongful* eviction thus occurs when the person recovering the property had no right to dispossess the other party from the property." (Alteration in original)); *cf. Day v. Watson,* 8 Mich. 535, 536 (1860) ("[T]he entry being followed by a continuous possession, which was inconsistent with the possessory title assured to the tenants under the lease, that possession amounts very clearly to an eviction.").

The Restatement (Second) of Property: *Landlord and Tenant* § 6.1 (hereinafter "the Restatement"), provides in pertinent part:

> Except to the extent the parties to a lease validly agree otherwise, **there is a breach of the landlord's obligations if,** during the period the tenant is entitled to possession of the leased property, **the landlord, or someone whose conduct is attributable to him, interferes with a permissible use of the leased property by the tenant.**

(Emphasis added).

Comment (a) to section 6.1 of the Restatement states that *"[t]he conduct in § 6.1 is more commonly referred to as an eviction by the landlord."* (Emphasis added). Comment (b) to section 6.1 of the Restatement further explains that "[a]n unauthorized possession of all or any part of the leased property by the landlord, or someone whose conduct is attributable to him, is an eviction of the tenant that could be cured by the tenant himself." One of the Illustrations given in Comment (b) is particularly relevant to the instant case:

> L leases land to T. T enters the leased property. Six months later L, without T's consent, takes possession of a building located on a remote corner of the leased premises that T is not currently using. L's possession of part of the leased property is unauthorized, and L is interfering with a permissible use thereof by T.

The actions of BTR in allowing Fidelitone to take possession of the premises leased to Source Interlink are more extensive than the Illustration discussed above. Source Interlink leased approximately 126,786 square feet of the Hampstead Facility,

of which 114,891 square feet was warehouse space and 11,895 square feet was office space. Clark, a member of BTR, "testified that Fidelitone used and occupied 115,000 square feet of Source Interlink's space, constituting substantially all of Source Interlink's warehouse space."

Although there was testimony that Source Interlink stored "a large piece of equipment" in the warehouse during the time Fidelitone occupied the premises, the impact of such equipment on the warehouse space used by Fidelitone was negligible. The equipment referred to was Source Interlink's air system, consisting mainly of a Twinn City Fan and Blower, *which was mounted on the roof.* Source Interlink wanted to sell the air system, and estimated that its removal would cost $8,500.00. The removal of the system would have included removing the rooftop divertor with a crane, removing the existing outside fan/blower motor and all attached ductwork, and patching three rooftop holes. Based on this removal plan, it is clear that the "large piece of equipment" had no impact on the square footage of Source Interlink's warehouse space used by Fidelitone. Consequently, Fidelitone took possession of virtually all of Source Interlink's warehouse space for approximately six months, from the end of May of 2007 until the last weekend of November of 2007.

Additionally, Fidelitone's use of Source Interlink's leased space was a "full operation." Raines observed that "all the bay doors were open, trucks were backed up to the bay doors for loading and forklifts were moving equipment around." Fidelitone used Source Interlink's battery chargers to charge Fidelitone's forklifts, as well as the heat and electricity in Source Interlink's premises. BTR admitted that it knew that Fidelitone was acting "like a tenant in Source Interlink's space" and that Fidelitone "was storing product, operating forklifts, and utilizing Source Interlink loading/unloading docks."

Moreover, Source Interlink neither consented to nor authorized Fidelitone's occupancy and use of its warehouse space.

Indeed, BTR unilaterally made the decision to move Fidelitone into Source Interlink's leased warehouse space without informing Source Interlink until approximately three weeks later. The communication informing Source Interlink was a letter describing Fidelitone's possession of the premises as *temporary*. Ramage, the National Property Manager of Source Interlink, then explicitly informed BTR that Fidelitone was in possession of the warehouse space *without Source Interlink's permission.*

BTR justifies its actions by explaining that Source Interlink had decommissioned the property, and thus the occupancy of Fidelitone did not affect Source Interlink's "use of the space and its activities with respect to the space." As discussed above, an eviction occurs when "the landlord, or someone whose conduct is attributable to him, interferes with a *permissible use* of the leased property by the tenant." Restatement § 6.1 (emphasis added). Comment (e) of § 6.1 defines "permissible use" as

> any use thereof that the tenant is authorized to make. *That particular conduct does not interfere with the manner in which the tenant is currently using the leased property does not cause the rule of this section to be inapplicable.* The tenant is entitled to complete freedom from interference by the landlord with any permissible use.

(Emphasis added). Accordingly, the fact that Source Interlink's actual use of the leased premises was not affected by Fidelitone's occupancy and use of such premises does not negate the finding of an actual eviction.

In sum, a landlord cannot permit one tenant to occupy the space of another without the latter's permission. Clearly, the unauthorized possession of Source Interlink's warehouse space by Fidelitone is attributable to BTR and is sufficient to constitute the actual eviction of Source Interlink. Therefore, the circuit court did not err in concluding that BTR evicted Source Interlink from the leased premises.

## II.

*Did the circuit court err by finding that Source Interlink
did not waive its right to claim an eviction and to
declare the Lease terminated?*

### A.

### Waiver of Right to Declare an Eviction

 In its closing memorandum of law before the circuit
court, BTR argued that Source Interlink waived the right to
claim a constructive eviction, because, *during Fidelitone's
occupancy of the space,* Source Interlink "continued to pay
rent and other charges from BTR [for four months], moved
equipment out of the space, approached [a prospective tenant]
about subleasing the space, and retained a new broker to
assist in subleasing the property." BTR also argued that
Source Interlink "never terminated the lease or took action to
express a belief that the lease was terminated until it filed this
suit four months after the flood," and, "with the exception of
paying BTR, nothing changed in the manner in which Source
[Interlink] approached the property before, during or after the
Fidelitone occupation." Therefore, BTR concluded that
Source Interlink's acts were "completely inconsistent with a
party claiming to have been constructively evicted," and that
"[j]udgment on the [c]omplaint and the [c]ounterclaim must be
entered in favor of BTR."

On appeal, despite minor changes, BTR's argument in its
original brief is identical to the argument in its closing memo-
randum. In other words, the gravamen of BTR's argument is
that Source Interlink waived its right to a declare a construc-
tive eviction because it waited an unreasonable time before
vacating the premises.[3] As discussed above, the action of

---

**3.** BTR's argument here is difficult to follow. BTR asserts that, "[e]ven
if there was a constructive eviction, Source [Interlink] clearly waived
it." BTR then cites to *Stevan,* for the proposition that a tenant may
waive the right to claim a constructive eviction "if he waits an unrea-
sonable length of time *before vacating the premises.*" 54 Md.App. at
241, 458 A.2d 466 (emphasis added). Yet, BTR relies on the same

BTR constituted an actual eviction, and thus Source Interlink did not have to prove that it vacated the premises, which is an element of constructive eviction. *See Stevan v. Brown*, 54 Md.App. 235, 240, 458 A.2d 466 (1983) (stating that a constructive eviction "occurs when the acts of a landlord cause serious or substantial interference with the tenants' enjoyment of the property which results in the tenant vacating the premises"). Consequently, BTR's waiver argument is inapplicable in the context of the instant case.

■ Even if we were to consider this issue, we agree with the circuit court that Source Interlink did not waive its right to declare an eviction for the period from the time of the flood in May 2007 until the filing of the instant action in September 2007. The court correctly reasoned:

A waiver is a knowing and voluntary relinquishment of a known right. In deciding whether Source Interlink's forbearance to declare an eviction and declare BTR's actions as a material breach of the covenant of quiet enjoyment, the Court first notes that Source Interlink fully performed all of its obligations under the Lease, while at the same time it received nothing amounting to consideration from BTR from the date of the flood to the date of this suit. Put another way, Source Interlink continued to bear all of the burden with none of the benefits of the Lease.

Source Interlink made proper, timely and multiple objections to BTR, who promised Fidelitone's interference would be "temporary." Not only did that statement turn out to be factually inaccurate, BTR breached its implied promise to make it true by failing to demand that Fidelitone move out until after this lawsuit was filed. Source Interlink was justified in doubting BTR's statements when BTR ceased communicating with Source Interlink on the issue and failed to respond to Source Interlink's oral complaints and the two

conduct of Source Interlink after the flood in support of its waiver argument as it does in support of its argument that Source Interlink failed to vacate the premises. Apparently BTR is arguing that Source Interlink's filing of the instant action in September 2007 constituted its "vacating the premises."

August letters over days, then weeks, then months. Although BTR also promised rent relief, that was not forthcoming either.

Implicit in BTR's waiver argument is the proposition that Source Interlink should not have relied upon BTR's unfulfilled promises or put up with BTR's dilatory ways as long as it did. If Source Interlink had been receiving some benefit under the Lease during this delay, BTR's position might be tenable, but since Source Interlink delayed legal action because of BTR's promises and while fully performing its Lease obligations, it cannot reasonably be concluded that Source Interlink did so with an intent to waive rights it had asserted. In hindsight, it is clear that BTR had no intention of fulfilling its promises, but Source Interlink was not unreasonable in trusting BTR to do so until the filing of this action. Source Interlink's actions do not amount to a waiver of any right assert[ed] or remedy requested [removed] in this case.

## B.

### Waiver of Right to Terminate the Lease

■ An actual eviction entitles the tenant to declare the lease terminated. *See Legg v. Castruccio,* 100 Md.App. 748, 781, 642 A.2d 906 (1994) ("A requirement of eviction is perfectly proper when the tenant seeks to terminate the lease and avoid further responsibility for rent ..." (Internal quotations omitted)); Restatement § 6.1 (stating that a tenant may terminate the lease if the landlord "interferes with a permissible use of the leased property by the tenant"). In the instant case, Source Interlink sought to terminate the Lease by filing the instant action against BTR in September 2007.

BTR argues, however, that "[r]egardless of whether this Court concludes that BTR actually or constructively evicted Source [Interlink], *the [c]ircuit [c]ourt was incorrect in concluding that Source[ ] [Interlink's] filing suit terminated the lease."* (Emphasis added). Focusing on Source Interlink's conduct *"after* suit was filed," BTR contends that "[b]ased on the [c]ircuit [c]ourt's findings of Source[ ] [Interlink's] conduct

in the space for the 15 months following Fidelitone's exit from Source[ ] [Interlink's] space, there can be no question that Source [Interlink] considered the lease was still in effect." (Bold and italicization in original). BTR points out:

Source [Interlink] continued to maintain and use the keys to access the property, continued to inspect and monitor the property, continued to adjust the heat in the property, continued to keep its equipment in the property, brought in prospective purchasers of the equipment to show it, continued to access the property for litigation purposes and otherwise exercised complete control and dominion over the space.

BTR thus concludes that Source Interlink waived its right to terminate the lease and is "responsible for all payments due under the lease from October 1, 2007 until its natural termination in January, 2010." We disagree and explain.

■ Although Source Interlink kept the keys to the premises, Source Interlink explained that it did so to continue to monitor the property for any vandalism or issues comprising the safety and security of the premises. During oral argument before this Court, Source Interlink stated that it viewed its decision to hold onto to the keys as "prudent," particularly because the circuit court had not yet declared the Lease terminated. Consequently, if something went wrong on the premises, Source Interlink could have been potentially liable. In fact, Raines discovered a gas leak during one of his inspections and was able to repair it before it caused any damage.

Additionally, the trial court found that any equipment left on the premises by Source Interlink was "residual" and "did not affect in any way BTR's retaking of the premises." The court added that

any effort to remove this property would have been inconsistent with the occupation of the premises by Fidelitone. The battery chargers were actually being used by Fidelitone, and the removal of the chute would have required not only roof but interior access into rental space then fully used by another business. Finally, while Source Interlink

did retain keys, it did so not to make commercial use of the space but to provide for the security of the premises during this dispute. This in no way interfered with Fidelitone's use of the premises.

Thus the trial court implicitly determined that Source Interlink did not waive its right to terminate the lease by finding that Source Interlink's actions did not affect Fidelitone's or BTR's use and/or retaking of the premises.

BTR argues that Source Interlink continued to bring "prospective purchasers" onto the property in order to sell the equipment, presumably the air system on the roof, but offers no citation to the record extract in support of its statement. The evidence demonstrates that Source Interlink hired Mohr Partners to show the premises to *prospective sublessees,* but that in mid-October of 2007, shortly after filing suit on September 28, 2007, Source Interlink instructed Mohr Partners to stop marketing the space for sublease. Thus BTR is incorrect in maintaining that Source Interlink continued to market the premises to sublessees or show the equipment located thereon after it filed suit.

Finally, Source Interlink at no time demonstrated an intention to waive its right to terminate the Lease and continue occupation of the premises. The facts as found by the trial court are that Source Interlink filed suit to terminate the lease of an already decommissioned property, ceased any commercial activities relating to the premises, such as subletting, and only held onto the keys for safety and security reasons. Therefore, we hold that Source Interlink did not waive its right to terminate the lease by its conduct after filing suit in September 2007.

### III.

***Did the circuit court err by ruling that the terms of the Lease did not permit the actions of BTR relating to Source Interlink's premises after the flood in May of 2007?***

BTR contends that "[t]he express terms of the Lease did not permit BTR to occupy Source[ ] [Interlink's] space."

Particularly, BTR argues that either paragraph 22 or paragraph 19 of the Lease authorized BTR to occupy the space.

Paragraph 22 of the Lease provides:

**22. Modifications to Lease; Rights of Superior Mortgagee, Superior Lessor. Landlord hereby notifies Tenant that this Lease may not be cancelled or surrendered, or modified or amended so as to reduce the Rent, shorten the Term or adversely affect in any other respect to any material extent the rights of Landlord** hereunder and that Landlord may not accept prepayments of any installments of Rent except for prepayments in the nature of security for the performance of Tenant's obligations hereunder **without the consent of the Superior Lessor and the Superior Mortgagee in each instance,** except that said consent shall not be required to the institution or prosecution of any action or proceedings against Tenant by reason of an Event of Default. If, in connection with the obtaining, continuing or renewing of financing for which the Building, the Land or the interest of the lessee under the Superior Lease represents collateral, in whole or in part, a savings or commercial bank or trust company, insurance company, savings and loan association, a welfare, pension or retirement fund or system or any other lender shall be or be willing to become the Superior Mortgagee and shall request reasonable modifications of this Lease as a condition of such financing, Tenant will not unreasonably withhold its consent thereto, provided that such modifications do not materially and adversely either increase the obligations of Tenant hereunder or affect the rights of Tenant under this Lease. Tenant shall not do or suffer or permit anything to be done which would constitute a default under the Superior Mortgage or the Superior Lease or cause the Superior Lease to be terminated or forfeited by virtue of any rights of termination or forfeiture reserved or vested in the Superior Lessor. **If any act or omission by Landlord would give Tenant the right, immediately or after lapse of time, to cancel or terminate this Lease or to claim a partial or total eviction, Tenant will not exercise any such right**

until: (i) it has given written notice of such act or omission to each Superior Mortgagee and each Superior Lessor, whose name and address shall have previously been furnished to Tenant, by delivering notice of such act or omission addressed to each such party at its last address so furnished; and (ii) a reasonable period for remedying such act or omission shall have elapsed following such giving of notice and following the time when such Superior Mortgagee or Superior Lessor shall have become entitled under such Superior Mortgage or Superior Lease, as the case may be, to remedy the same (which shall in no event be less than the period to which Landlord would be entitled under this Lease to effect such remedy) provided such Superior Mortgagee or Superior Lessor shall, with reasonable diligence, give Tenant notice of intention to, and commence and continue to, remedy such act or omission or to cause the same to be remedied.

(Emphasis added).

The circuit court ruled that Source Interlink's cause of action against BTR was "not barred by paragraph 22 of General Terms and Conditions," and explained that "[s]uch a provision which seeks to insulate a landlord from liability for willful and intentional interference with permissible uses by the tenant contravenes public policy and is void."

Certainly paragraph 22 would be void if it precluded Source Interlink from terminating the Lease where BTR's conduct constituted an eviction of Source Interlink under Maryland law. Paragraph 22, however, does not prohibit such action. The title of paragraph 22—Modifications to Lease; Rights of Superior Mortgagee, Superior Lessor—indicates that the provision addresses the rights of the superior mortgagee or superior lessor, if one or the other existed. The provision explains that if the acts or omissions of the landlord give the tenant the right "to cancel or terminate" the lease or "to claim a partial or total eviction," the tenant must first provide "written notice" of the landlord's "act or omission to each Superior Mortgagee and each Superior Lessor" in order to

permit the Superior Mortgagee or Superior Lessor to remedy the situation. Neither BTR nor Source Interlink contend that there was a Superior Mortgagee or Superior Lessor to the premises. Accordingly, paragraph 22 of the Lease did not permit the actions of BTR relating to Source Interlink's premises after the flood in May of 2007.

■ Paragraph 19 of the Lease states:

**19. Right of Entry.** Landlord and its representatives shall have the right at all reasonable times during normal business hours with prior oral or written notice to enter the Premises for the purposes of inspecting them and exhibiting them for sale or financing; and Landlord shall not be liable in any manner for any entry into the Premises for such purposes. **Landlord reserves and shall at all times have the right to re-enter the Premises upon 24 hours prior notice to Tenant (except in an emergency) to maintain, repair and replace the Premises and any portion of the Building of which the Premises are a part, without abatement of Rent.** Landlord may for the purpose of such work erect, use and maintain scaffolding, pipes, conduits and other necessary structures in and through the Premises where reasonably required by the character of the work to be performed, provided that entrance to the Premises shall not be blocked. Landlord agrees to use its commercially reasonable efforts to minimize the disruption or interference with Tenant's business that might result from ·Landlord's exercise of such rights. For so long as Landlord uses such reasonable efforts, Tenant waives any claim for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Premises and any other loss occasioned by any such maintenance, repair or replacement work.

(Emphasis added).

The circuit court found that BTR's "actions were not justified under the emergency entry provisions of the Lease." As the circuit court explained,

[t]he Lease at paragraph 19 of the General Terms and Conditions permits landlord to enter Source Interlink's space to "maintain, repair and replace the Premises." That right does not render lawful BTR's entry for the purpose of conferring commercial benefits upon Fidelitone, even if same is for the purpose of limiting BTR's liability occasioned by its breach of lease with Fidelitone. The only "emergency" here was that of Fidelitone, and how it was to continue its business, but that did not justify appropriation of the demised premises, even if BTR concluded or was concerned that the flood was its fault.

In our opinion, paragraph 19 permitted BTR to enter *Fidelitone's premises* after the flood to "maintain, repair and replace" the damage caused by the flood, which qualified as an "emergency." The flood was caused when a closed-loop water pipe burst *in the ceiling of Fidelitone's space.* Thus the emergency was confined to Fidelitone's premises, and there was no need for BTR to enter Source Interlink's space to respond to the emergency.

Paragraph 19 would have permitted BTR to enter Source Interlink's space if a pipe had burst in Source Interlink's ceiling and caused a flood in Source Interlink's space, or perhaps, if a pipe had burst in Source Interlink's ceiling and caused a flood in Fidelitone's space. In those scenarios, the source of flood would be Source Interlink's premises, and BTR would have been justified to enter Source Interlink's premises to repair the broken pipe.

Paragraph 19 certainly does not permit Fidelitone, under the authority of BTR, to occupy Source Interlink's space for six months because of an emergency in Fidelitone's space, particularly when the "exigency ... ended no later June 15, 2007," approximately two weeks after it began. Therefore, the circuit court did not err by ruling that paragraph 19 did not authorize the actions of BTR relating to Source Interlink's premises after the flood in May of 2007.

## IV.

### *Did Source Interlink prove damages to a reasonable certainty?*

 The circuit court found "[t]he total amount of base rent, CAM charges, insurance, and real estate tax payments that Source Interlink paid to BTR during the months of June, July, August, and September of 2007 was $149,466.04." Based on that finding, the circuit court entered a judgment for damages in the amount of $149,466.04,[4] and explained that "[t]he damages for the breach prior to the filing of this action [was] the fair market value of what Source Interlink was to receive under the Lease, and what it did receive, *i.e.,* the monthly payments from June through September of 2007."

On appeal, BTR argues that Source Interlink failed to prove damages to a reasonable certainty, because Source Interlink "made no effort to demonstrate [ ] the reduced value of its interest in the property" given the fact that Source Interlink "continued to storing equipment in [its] space throughout the Fidelitone occupation and to this day." (Emphasis omitted).

BTR does not expressly identify the equipment to which it refers. We assume that BTR is referring to the air system mounted on the roof. As discussed above, the air system consisted of a rooftop divertor, an outside fan/blower motor, and attached ductwork and took up a negligible percentage of the square footage of Source Interlink's warehouse space. Thus the circuit court impliedly found that whatever space this piece of equipment occupied was inconsequential to the usable warehouse space and thus had no effect on the rental value. Therefore, we hold that Source Interlink proved its damages to a reasonable certainty, and the circuit court was not clearly erroneous in determining the amount of its award.

**JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY AFFIRMED; APPELLANT TO PAY COSTS.**

---

4. See footnote 1, *supra.*